[Cite as *Serdy v. Serdy*, 2013-Ohio-5532.]

STATE OF OHIO, NOBLE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| MISTY SERDY, | ) | |
| | ) | CASE NO.    13 NO 400 |
| PETITIONER-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| JEROME SERDY, | ) | |
| | ) | |
| RESPONDENT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from Common Pleas Court,
Domestic Relations Division, Case No.
213-0026.

JUDGMENT: Affirmed.

APPEARANCES:
For Petitioner-Appellee:              Attorney Robert Henry
                                      Southeastern Ohio Legal Services
                                      472 2nd Street
                                      Marietta, Ohio  45750

For Respondent-Appellant:             Attorney Margaret Boyd LaPlante
                                      139 West 8th Street
                                      P.O. Box 640
                                      Cambridge, Ohio  43725

JUDGES:
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

                                      Dated:  December 9, 2013

VUKOVICH, J.

{¶1} Respondent-appellant Jerome Serdy appeals the decision of the Noble County Common Pleas Court granting a five-year civil protection order as requested by petitioner-appellee Misty Serdy. He urges that the court's decision was not supported by a preponderance of competent and credible evidence. For the following reasons, the trial court's decision is upheld.

STATEMENT OF THE CASE

{¶2} The parties were married and had three children aged 14, 12 and 9 at the time of the dispute. On December 31, 2012 at 7:00 p.m., the police were called to the marital residence by the wife after appellant took out a shotgun and some shells and threatened to kill himself and burn down a camping cabin they had built. When police arrived, appellant had left the residence. They found him in his car in the wife's parents' driveway; he had a shotgun and two shotgun shells in the vehicle.

{¶3} On February 11, 2013, the wife filed a petition for a domestic violence civil protection order under R.C. 3113.31. Where the form petition asked for the acts engaged in by the respondent, the wife wrote that: she left on December 31 because appellant had a shotgun and said he was going to kill himself; since then, he had been texting, calling and coming to the house; and she and her children were fearful that he will harm one of them if he comes into the house. The trial court granted an ex parte restraining order that day.

{¶4} A full hearing on the petition proceeded on February 20, 2013, where appellant appeared with counsel and the wife acted *pro se.* The wife testified that they had been arguing for the past couple years since he lost his job. She explained that they were home on New Year's Eve with the two younger children when appellant told her she was going to be a rich widow. (Tr. 18). He then retrieved a shotgun and shotgun shells.

{¶5} She testified that her first thought was that she needed to get her children and hide them. She took the two children into a bathroom, locked the door, and turned out the lights. She then pushed the screen out of the window and instructed her children that if appellant tried to enter, she would lower the kids to the

ground and they were to run without looking back. She said they were scared to death. The wife then called 911 and told them about appellant's suicide threat and his threat to burn down their camping cabin (which she "love[s] very dearly"). (Tr. 19, 26).

{¶6} She explained that it took police almost 20 minutes to arrive due to snow. When they arrived, she called to them from the window and refused to come out until they ensured appellant was gone. When advised that his vehicle was gone, she opened the door for the officers. (Tr. 19). One officer stayed with her while others searched for appellant. The officer kept the lights off in case appellant came home. The wife testified that she was scared while they waited. (Tr. 20).

{¶7} She testified that the police found appellant in the driveway at her parents' house with an unloaded shotgun in the backseat and two shotgun shells in the front cup holder. (Tr. 19-20). Appellant was brought to a hospital for a psychiatric evaluation, and the police contacted a domestic violence worker who placed the wife and children in a hotel for two nights. Thereafter, they stayed with friends. (Tr. 20). When the detective asked her about filing for a protection order, she stated that she wanted to get things in order and do it later. (Tr. 26). After a couple weeks, appellant moved out, and she and the children moved back into the house. She changed all of the locks. She testified that she has a 45 minute recording on her phone wherein appellant demanded a house key. She refused and told him that she felt threatened by him due to the involvement of the shotgun. (Tr. 25).

{¶8} The wife also testified that appellant began texting her incessantly. (Tr. 21-23). She testified that she told him to stop texting her and that she asked the Sheriff to tell him to stop as well, which worked for only two days. (Tr. 29). When defense counsel asked if she complied with a subpoena to bring the parties' phone records since New Year's Eve, she produced some records and noted how many pages were involved in just a couple of days. (Tr. 22-23, 28). She explained that she had no money, her printer was broken, and thus, she could not print what would

probably amount to 400 pages of texts and phone calls. (Tr. 22-23). She offered to log into the account on her laptop to show the defense the records. (Tr. 22).

{¶9} The wife expressed concern that two different vehicles drove down her lane since the temporary restraining order. She said that she set up surveillance cameras as a result. (Tr. 24). She also hung sheets on the windows for fear that he will be looking in, also expressing fear that appellant can still get his hands on guns and that he took an axe with him when he left. (Tr. 56). She noted that appellant attended their child's basketball game since the temporary order, but the Sheriff told her that she should not have gone if she thought he would be there with their child. (Tr. 24). She also related that a friend drove her to a basketball game and that he had his tires slashed after leaving it that night at a park-and-ride. (Tr. 29-30). This friend had been staying at her house "for protection" because appellant kept texting her and she believed "he was coming down my lane." (Tr. 30). She stated that, as a result of all this, she was scared for her life. (Tr. 56-57).

{¶10} On cross-examination, it was elicited that the wife drove 65 miles with appellant to a child's basketball game since the New Year's Eve incident. (Tr. 26-27). She explained that it was for her daughter and that she had no gas money. She was asked if she brought appellant food to eat at his father's house, and she answered that she used her food stamps to buy him food and she dropped it off while bringing her children over for visitation. She also noted that when he dropped by without her assent with firewood, she kept the doors locked. (Tr. 27). She reasoned that when a person grabs a shotgun, one experiences a fear to run away from them not toward them. (Tr. 57).

{¶11} The wife's sister testified briefly about an overnight visit to their camping cabin two years prior. She stated that they were at the cabin with their children when appellant burst in unannounced and stomped on the wife's hand while trying to get her phone. (Tr. 3-4). She testified that the couple then argued for four hours. (Tr. 4).

{¶12} The parties' oldest child testified that when the three children visit with their father, he continually asks questions about their mother. (Tr. 6). She explained how appellant told her a long story about his life, while crying and bashing his head

on the table. She said he was squeezing her hand and would not let her go. (Tr. 7). The child had a tape of the four-hour-long conversation on her phone. (Tr. 6-8). On the portion played to the court, appellant told his daughter about past child support he paid for other children, complained about previously losing his "fucking job," talked about feeling useless, and spoke of how he is more than 20 years older than her mother. He even told his daughter that everyone looks at her mother, that people "look at her crotch", and that "they all want to fuck her," while insisting "your mother loves me." (Tr. 12-14). He also stated, "I tried to be stupid with a fucking gun, it all backfired." (Tr. 14). He then told his daughter that they had talked about a double grave and how he did not want a single grave but instead wanted his wife buried beside him; he then qualified this with "sometime, whenever, 30, 40 years from now, 40 years." (Tr. 15).

{¶13} The defense called to the stand the detective who had to provide four-wheel drive transportation for the police officers to get to the Serdy residence on New Year's Eve as a result of the snow. He noted that when they arrived, there was no answer at the door but the wife was yelling to them from the bathroom window as she was not sure if appellant was still present. (Tr. 32). He related that the wife told appellant that she wanted to split up at which point appellant took the shotgun from a rack and said he would burn the cabin and then shoot himself there. (Tr. 33). He explained that he found appellant in the wife's parents' drive with the shotgun in the backseat. (Tr. 33). Appellant told him that he threatened to kill himself in order to get his wife's attention to see if she cared. Tr. 33).

{¶14} Several firearms were taken from the residence the night of the incident; he believed that one gun was returned to the wife and the rest went to appellant's brother. (Tr. 34). The day after the incident, the wife asked the detective to retrieve the children's school bags from the house, the detective recommended that she file for a protection order if she was scared, and she advised that she was not ready to do that yet. (Tr. 34). She also revealed that there might be more guns in a safe in the basement, which belonged to a brother. (Tr. 35).

{¶15} Some deputies testified that they believed the wife reported to 911 that appellant had already left the residence and that appellant said that his wife would be a rich widow by morning. (Tr. 37-38, 42). The deputy who stayed at the house during the search for appellant opined that the wife and children were very stressed and the wife was in fear that he might return. (Tr. 42). No charges were filed against appellant.

{¶16} The defense called a Children's Services caseworker to the stand. She testified to receiving a report of neglect on January 9, 2013 (apparently as a result of the incident). The caseworker contacted the wife, who responded to the complaint by denying that there was a threat of harm to herself or the children when appellant retrieved the shotgun. (Tr. 43). On January 28, the wife again denied that there was a threat of harm to them due to the shotgun incident, and the children concurred. The caseworker noted that although the wife denied there was a threat, the wife had taken measures to protect herself after the incident, including changing the locks on all of the doors. (Tr. 44-45). After she interviewed appellant, she closed the case.

{¶17} Appellant then testified that on New Year's Eve, he noticed his wife putting make-up on and asked where she was going. She said stated that she was going to a party. Appellant testified that she said that he does not "own" her and that she admitted she had a boyfriend. (Tr. 46). When he told her he loved her, she told him the marriage was over.

{¶18} Appellant explained that he remembered that once (when he was going to approach someone who threatened him) his wife begged him not to go because she loved him. So, he claimed he was testing her to see if she was serious about leaving him, hoping she would run after him. He took the shotgun and some shells and went out the door saying, "you may or may not be a rich widow in the morning" and "I'm leaving." He threw the gun in the back of the car and the shells in the front and went to speak to her father. (Tr. 27). He stated that he was released from the psychiatric ward after two hours. He also testified that he could never harm his wife and children and that he did not knowingly threaten to harm her. (Tr. 48).

{¶19} He testified that after the incident, his family stayed in an unknown location for 15 days during which he called and texted to ask them to come home. (Tr. 48). He then moved into his father's house so that she could move back in. Appellant testified that his wife has since called him to clean the chimney, take out the trash, and to bring firewood into the garage. (Tr. 49). He stated he sat at their home talking to his children ten times since he moved out, and she came to his father's house to help him rearrange and clean. (Tr. 50).

{¶20} In emphasizing that they drove to a basketball game together, appellant made reference to meeting at a park-and-ride. (Tr. 51). He stated that the calling and texting back and forth was mutual and he was trying to reconcile. (Tr. 51-52). Appellant denied slashing anyone's tires, denied that the police contacted him on the matter, and stated that he was probably at work that night as he works 10:00 p.m. until 6:00 a.m. (Tr. 53). Notably, the wife had testified that the police contacted appellant about the tires, and when asked why she felt imminent physical harm regarding the tires, she responded, "Because I'm not stupid and I know who slashed the tires." (Tr. 30).

{¶21} At the end of the hearing, the trial court granted a full civil protection order for the maximum period of five years, which included a 500-foot restriction and a prohibition against the possession of deadly weapons. An exception was provided so that appellant could attend the children's extracurricular events, and visitation with the children was to be arranged through his brother rather than direct contact. The husband filed a timely notice of appeal from that February 20, 2013 order.

ASSIGNMENT OF ERROR

{¶22} Appellant's sole assignment of error provides:

{¶23} "THE DECISION OF THE COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND THE COURT'S DECISION CONSTITUTED AN ABUSE OF DISCRETION."

{¶24} Appellant argues that the judgment was contrary to the manifest weight of the evidence and unreasonable, urging that there was not credible evidence that the wife was in imminent danger of domestic violence and there was no threat of

force. He states that there was no evidence that he slashed her friend's tires and posits that the New Year's Eve incident was not threatening since they communicated thereafter and she denied a threat to the caseworker. He also contends that the trial court abused its discretion by focusing on the wife's subjective state of mind in its comments after the hearing.

**{¶25}** The domestic violence civil protection order provided for in R.C. 3113.31 is filed (for an adult) in the domestic relations court but is filed in the general division where (as here) the county does not have a domestic relations division. R.C. 3113.31(A)(2)(c). The petition shall contain or state: (1) an allegation that the respondent engaged in domestic violence against a family or household member of the respondent, including a description of the nature and extent of the domestic violence; (2) the relationship of the respondent to the petitioner, and to the victim if other than the petitioner; and (3) a request for relief under this section. R.C. 3113.31(C)(1)-(3). The petitioner's right to relief is not affected by the petitioner's leaving the residence or household to avoid further domestic violence. R.C. 3113.31(B).

**{¶26}** The applicable domestic violence referred to in this statute involves placing a family or household member in fear of imminent serious physical harm by the threat of force. R.C. 3113.31(A)(1)(a)-(b). When granting a civil protection order under R.C. 3113.31, the trial court must find by a preponderance of the evidence that the petitioner (or a family or household member) is in danger of domestic violence. *Felton v. Felton*, 79 Ohio St.3d 34, 42, 679 N.E.2d 672 (1997). Preponderance of the evidence is defined as the greater weight of the evidence or as evidence that leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *State v. Stumpf*, 32 Ohio St.3d 95, 102, 512 N.E.2d 598 (1987).

**{¶27}** As aforementioned, appellant mentions abuse of discretion and weight of the evidence in his arguments. The precise standard of review of a protection order on appeal depends upon the challenge being made. For instance, an abuse of discretion standard of review is employed if the challenge concerns the scope of the order. *Williams v. Hupp*, 7th Dist. No. 10MA112, 2011-Ohio-3403, ¶ 21; *Caban v.*

*Ransome*, 7th Dist. No. 08MA36, 2009-Ohio-1034, ¶ 7. *See also McBride v. McBride*, 12th Dist. No. CA2011-0-061, 2012-Ohio-2146, ¶ 10; *Abuhamda-Silman v. Silman*, 161 Ohio App.3d 541, 2005-Ohio-2836, 831 N.E.2d 453, ¶ 9 (8th Dist.).

**{¶28}** Appellant does not challenge the scope of the order here. Rather, he essentially asserts that the trial court applied the wrong legal test, and he then argues that there was not a preponderance of competent, credible evidence to support the order and thus the order is contrary to the manifest weight of the evidence. Thus, after reviewing the claim regarding the trial court's findings and conclusions, we must conduct a typical weight of the evidence review. *Id.*

**{¶29}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence" supporting one side over the other. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, 17, applying *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Eastley*, 132 Ohio St.3d 32 at ¶ 12. A reversal on weight of the evidence is ordered only in exceptional circumstances. *Thompkins*, 78 Ohio St.3d at 387.

**{¶30}** To reverse on weight of the evidence, the appellate court would have to find that the trier of fact clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice. *Id.* We note here that circumstantial evidence and direct evidence inherently possess the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492(1991).

**{¶31}** In weighing the evidence, the court of appeals must always be mindful that every reasonable presumption must be made in favor of the finder of fact. *Eastley*, 132 Ohio St.3d 328 at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3. It is the fact-finder who is best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses testifying before it. *See Seasons Coal*, 10 Ohio St.3d at 80; *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). We thus proceed under the theory that when there are two fairly reasonable views of the evidence or two conflicting versions of events,

neither of which is unbelievable, it is not our province to choose which one should be believed. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶32}** It has been stated that where the threat is not explicit, the critical inquiry is whether a reasonable person would fear imminent serious physical harm due to the respondent's acts or conduct. *Bruner v. Bruner*, 7th Dist. No. 99CA285 (Sept. 22, 2000). The petitioner's history with the respondent is one relevant consideration in determining the reasonableness of the fear felt by the petitioner. *Id.; Solomon v. Solomon,* 157 Ohio App.3d 807, 813 N.E.2d 918, 2004-Ohio-2486, ¶ 27 (7th Dist.). The assessment involves both subjective and objective components. *Martauz v. Martauz*, 7th Dist. No. 08MA135, 2009-Ohio-2642, ¶ 40. *See also Smith v. Burroughs*, 3d Dist. No. 16-09-03, 2010-Ohio-4806, ¶ 16.

**{¶33}** Thus, contrary to appellant's first suggestion, the trial court properly referred to the wife's subjective state of mind as a factor in its decision. Although the trial court made much of her subjective belief that she was in danger, the court did not suggest that the subjective component was the *sole* test.

**{¶34}** At the end of the hearing, the court stated on the record that the wife had to convince the court by a preponderance of the evidence that she was in danger of domestic violence. The court said that prior violence was not required, that a threat was sufficient, that prior evaluated events need not be recent, and that the victim's fear (not the respondent's intent) was at issue. (Tr. 58). The judge expressed that he was troubled with the introduction of a gun into the argument. The court pointed to the officer's testimony that the wife and children were terrified that night.

**{¶35}** The court then stated that what tipped the scales here was the wife's subjective state of mind. (Tr. 59). Contrary to appellant's suggestion, this is not equivalent to saying that her subjective belief was the only factor considered. Rather, it was a statement regarding the wife's credibility and an expression regarding the final consideration in the balancing of the two scales on each side of the case. The trial court clearly considered the totality of the circumstances in this case, and its statements on the record do not evince improper statements of law.

**{¶36}** The trial court heard the testimony and believed the wife's claim that she feared for her safety as a result of the combination of various events and circumstances. Such expressions of fear are a matter of credibility best left for the trial judge who was able to witness her voice inflection, gestures, demeanor, etc. as she testified and presented her case pro se. *See Seasons Coal*, 10 Ohio St.3d at 80. The remaining focus on appeal turns on whether the wife's fear was reasonable. *See Martauz*, 7th Dist. No. 08MA135 at ¶ 41.

**{¶37}** We cannot conclude that no reasonable person would fear for their own and/or their family's safety where after learning the marriage was over, a husband threatens to burn down your cabin and to kill himself and then grabs a shotgun and more than one shell for that gun. Initially, we note that his act of holding a gun and declaring that he is going to kill himself presented a real threat to the safety of those around him. There are reasonable concerns of stray bullets from a person in that state of mind. Someone (including one of his children) could attempt to stop him from leaving (which is just what he admittedly wished his wife would do) and grab the arm holding the gun. He suggested he loaded the shells into the gun as it was unloaded when the police confiscated it, but this need not be accepted as true and the gun may have already (purposely or accidentally) contained a shell when he grabbed it.

**{¶38}** Next, we note that appellant's own testimony was that he told his wife that she "may or may not be a rich widow in the morning." This could suggest not only a dangerously unstable emotional state of impending suicide but could also be interpreted to mean that she may or may not be alive in the morning to collect on his death. In any event, threats of suicide, arson (albeit of another structure), and an accompanying retrieval of a weapon and ammunition while in the house with one's newly estranged wife and one's children cannot be taken lightly and need not be seen unequivocally as purely self-threatening behavior. Such behavior is cause for great concern. In today's world of escalating murder-suicide domestic events, a reasonable person could rationally fear for her life in that same situation.

{¶39} The wife's fear is supported by her acts of locking herself and her children in the bathroom and turning off the lights, formulating an escape route for the children that involved her lowering them out of a window with instructions to run without looking back, calling 911, remaining locked in the bathroom with her children for nearly 20 minutes, and asking police to ensure appellant was gone prior to alighting from the bathroom. An officer's testimony confirmed her apparent fear that night.

{¶40} A detective also apparently believed that the wife was fearful of her safety as he testified that he advised her to seek a protection order when she came to the police station a few days after the event to seek assistance retrieving items for the children from the house. When so advised, her answer to the detective suggested that she would soon but was not ready yet. Notably, she took a domestic violence worker up on the offer of a hotel room for two nights and then spent two weeks at a location undisclosed to appellant. Thus, she went into hiding for more than two weeks after the incident. She then did not return to the house until he moved out. At that point, she changed the locks and refused to provide him with a key, notwithstanding his adamant demands to do so.

{¶41} Although she denied that she or the children were in danger to a Children's Services caseworker, this was in response to an investigation that her children were suffering from neglect as a result of the incident. As aforementioned, a responding police officer witnessed and believed her fear that night. And, she advised the caseworker that she changed the locks at the house. After doing so, appellant tried to demand the keys from her. She believed that appellant slashed her male friend's tires and that he pulled into her driveway after the temporary order, prompting her to have a surveillance camera installed. She also hung sheets on her windows.

{¶42} Had the wife sought the order closer in time to the main event, the case would not be a close one. However, merely because she did not seek the protection order right away does not preclude her from seeking protection six weeks later. This was a consideration for the fact-finder, who heard evidence showing her continued

fear and explaining her rationale. She sought help from the authorities immediately on New Year's Eve. She ensured that multiple weapons were confiscated that night and supplemented her report days later when she remembered where other weapons were stored. She stayed at undisclosed locations for more than two weeks right after the incident. She advised the court that she tried to be nice, but appellant pushed her to the limit. Essentially, she was holding on to hope that her children's father would accept the situation regarding their marital separation and that she would not need to resort to court proceedings against him. Instead, she was then faced with unwanted visits, multiple phone calls, and allegedly incessant texts, resulting in a decision to ask the Sheriff to tell appellant to stop, which worked at first.

{¶43} Moreover, appellant's decision-making was called into question again when he rambled to their 14-year-old daughter (seemingly in the presence of the two younger children) for an inordinate amount of time while making inappropriate comments throughout the monologue ("Everywhere she goes guys look at her. * * * They look at her crotch" and "she's a piece of (inaudible) ass to them"), engaging in acts of self-injurious behavior (bashing his head against the table), and squeezing the child's wrist so that she could not leave the kitchen table for hours. He also made worrisome comments about double graves. A rational person could fear for their safety upon learning of and then listening to a recording of appellant's litany recorded by her daughter *in combination* with the other circumstances, including the shotgun incident.

{¶44} The trial court was faced with the task of weighing the evidence and the reasonable inferences to be drawn therefrom and judging the credibility of the wife and appellant. Appellant testified that he did not threaten anyone but himself and that he was lying when he threatened suicide and arson. He testified that he did not slash the wife's friend's tires. The wife set forth her concerns and her evidence. The trial court heard and saw the various testimonial indicators of truthfulness and sincerity, including demeanor, gestures, voice inflection, and eye movements. The trial court also heard the recording portraying appellant's state of mind during his visitation with his children, which recording was preserved for this court only through

transcription. We do not substitute our judgment for that of the fact-finder or reweigh the evidence except in extraordinary circumstances where there has been a manifest miscarriage of justice.

{¶45} Although the wife's case could have been better presented had she retained an attorney to question herself and the other witnesses, we conclude that a rational trier of fact can find that she presented credible evidence which caused her and could cause a reasonable person to feel threatened with imminent serious physical harm. Even though some rational fact-finder could find that the wife's fears were unfounded, another rational fact-finder could conclude that her fears were reasonable under the totality of the circumstances of the case. Upon carefully reviewing the record, we conclude that the trial court's decision to grant a protection order was not contrary to the manifest weight of the evidence.

{¶46} For the foregoing reasons, the judgment of the trial court is hereby affirmed.


Waite, J., concurs.
DeGenaro, P.J., concurs.