[Cite as *Hammond v. Sait*, 2023-Ohio-893.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

TYLER HAMMOND,

Petitioner-Appellee,

v.

ROCCO SAIT,

Respondent-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 MA 0032**

---

Civil Appeal from the
Court of Common Pleas, Domestic Relations Division, of Mahoning County, Ohio
Case No. 21 DV 773

**BEFORE:**
David A. D'Apolito, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Reversed and Vacated.

---

Tyler Hammond*, Pro Se*, Petitioner-Appellee (No Brief Filed) and

*Atty. Jason M. Rebraca,* 12 West Main Street, Canfield, Ohio 44406, for Respondent-Appellant.

Dated: March 15, 2023

**D'Apolito, P.J.**

{¶1}  Respondent-Appellant, Rocco Sait, appeals the judgment of the Mahoning County Court of Common Pleas, Domestic Relations Division, granting a domestic violence civil protection order ("DVCPO") to Petitioner-Appellee, Tyler Hammond, pursuant to R.C. 3113.31.  No brief was filed by Appellee.  For the following reasons, the judgment entry of the domestic relations court is reversed and vacated.

## FACTS

{¶2}  According to the DVCPO petition, which was filed on December 2, 2021, Appellant had been stalking Appellee since 2016.  The DVCPO petition reads, in pertinent part:

> My relations with [Appellant] began in December of 2015 – at the time I was 21 and he was 31.  At the time I didn't realize he was stalking me – I thought it was endearing and serendipitous that we kept encountering each other at the same places at the same time. Not until towards the end of our official relationship did it occur to me that his behavior was erratic and not normal and that he had been stalking me – showing up at my work, at my parent's [sic] house, etc. uninvited and unwarranted.  During the relationship and my time living with him (December 2017 – September 2018) and before our official relationship was established, he psychologically, emotionally, sexually, and mentally abused me.  He was highly manipulative and towards the end of the relationship became aggressive, antagonizing, and intimidating.  He has been stalking my current partner and I off and on for the last three years. Recently he has been showing up at my place of work. My employer and manager have both told him several times not to come in and to leave if I am working – he still shows up when I am working.  Last week, he antagonized and started a physical altercation with my partner and I – and that was the last straw.  I believe him to be a dangerous person and just want him to stay away from me and my partner.

(12/2/21 Pet., p. 3-4.) An ex parte DVCPO was issued on the same day that the petition was filed.

{¶3} The lion's share of the testimony at the hearing on the DVCPO described events that occurred at the Draught House, a downtown bar, on November 24, 2021, the night before the Thanksgiving holiday. At the hearing, the magistrate accepted the testimony of Appellee, Appellee's mother, Appellee's then-boyfriend, Maverick Boyer, Appellant, Appellant's then-girlfriend Alexis Gordulic, and Jeremy Petronelli, one of the bartenders working at the Draught House that evening. Appellee, acting *pro se*, Appellant's attorney, and the magistrate each examined the various witnesses.

{¶4} According to the testimony offered at the hearing on January 24, 2022[1], Appellant had been a regular patron of the Draught House for over ten years, prior to his romantic relationship with Appellee. Appellee had been employed at the Draught House for roughly one year.

{¶5} Appellee testified that she provided to the magistrate screen shots of texts between Appellant and Appellee's supervisor, in which Appellee's supervisor told Appellant "multiple times not to come into the bar when [Appellee was] working." (1/24/22 Hrg. Tr., p. 4.) Appellee's supervisor did not testify at the hearing.

{¶6} The only relevant text in the record is denoted as "Roxy" (presumably Appellee's supervisor at the Draught House) and includes a conversation with Appellant after the events on Thanksgiving Eve of 2021. The relevant text reads, "[W]hy can't you stop? I asked you not to go in the bar when [Appellee] worked. You didn't. Jordan asked you not to go in the bar when [Appellee] worked. You didn't." However, Appellee conceded at the hearing that she was not working on the evening in question, she was a patron of the bar.

{¶7} The confrontation that Appellee characterized as the "last straw" in the DVCPO petition is captured on a security camera at the bar. However, the black-and-white footage is blurred and does not clearly depict the events. Large portions of the testimony purport to clarify the events captured in the video, however, most of the

---

[1] The hearing was originally scheduled to proceed on December 16, 2021, but was continued twice due to the parties' efforts to access a security video depicting a physical altercation between the parties that gave rise to the DVCPO petition at issue in this case.

testimony fails to inform our review due to the manner in which the testimony was offered. Adding to the difficulty in interpreting the witnesses' narration, there are four separate videos and neither the witness nor the magistrate identifies the video that is being described.

{¶8} There are four videos that capture the activity of the various bar patrons before and after the altercation between the parties. There is only one video that depicts the altercation itself.

{¶9} In that video, Appellee and Boyer (her then-boyfriend) are standing at the center of the bar when Appellant walks up to the couple and reaches around Boyer's head and places his hand there. Appellant draws Boyer's face toward his own and kisses Boyer on the cheek. Boyer has no discernable reaction. Appellant then walks to the end of the bar where Gordulic (Appellant's then-current girlfriend) is standing. Within a few seconds, Gordulic walks from where she was standing with Appellant over to Appellee and Boyer. A few words are exchanged then Gordulic walks a few feet from the bar, but she remains parallel to Appellee and Boyer.

{¶10} Next, Appellant walks over and steps in the space between Appellee and Gordulic and begins conversing with Gordulic. The two couples are engaged in separate conversations. Initially, Appellee and Appellant are back-to-back, then Appellee turns toward Appellant and punches him. He reacts by turning and moving toward her, which causes a scuffle between several people standing at the bar. The scuffle is a blur and it is impossible to determine the actions of the respective parties, other than Appellee's initial assault on Appellant. Petronelli (the bartender) sees the scuffle and jumps over the bar, but by the time he approaches the group, the altercation has ended.

{¶11} According to Boyer, roughly five to ten minutes after he, Appellee, and a friend arrived at the bar, Appellant approached Boyer and tried "physically, to kiss [Boyer] or touch [Boyer]." Boyer "refused [Appellant] * * * told [Appellant] this is unnecessary and attempted to get [Appellant] off of [Boyer]." Gordulic (Appellant's girlfriend) intervened, separated the two men, and apologized to Boyer, then Boyer "went on [his] separate way to get a drink, talk to [his] friend, you know kind of blow it off." (*Id.* at p. 23.)

{¶12} Appellant approached Boyer "three, four, several [additional] times." Each time, Boyer told Appellant that they did not need to speak, but Appellant persisted. According to Boyer:

> After, you know, probably the fourth or fifth interaction I guess he was behind me. A friend of mine was kind of shoeing [sic] me, continued to try to approach me. At which point some – me and her [sic] (inaudible) occurred. I was knocked down. You know, I'm not really sure after that point. But I was knocked down and in the middle so.

(*Id.* at p. 24.)

{¶13} Boyer was asked where the foregoing events took place. He responded:

> That was at the end of the bar from the (inaudible) happened. I was simply sitting minding my business. Not – ignoring him, once again, like I said. And he continued to try to approach. At which point there was an altercation between the majority of the people in the bar at that time to separate the parties. So I don't know because I was knocked down. I was behind everybody.

(*Id.*)

{¶14} Boyer was asked by the magistrate if he was on the ground, as the video did not depict anyone falling to the floor. He responded, "I was pushed against the bar." He conceded that he did not witness "what caused the eruption of people." (*Id.* at p. 26.) He further conceded that he was not aware of any physical or violent history between Appellee and Appellant. Boyer testified that he was in the same location as Appellant roughly thirty times in the past three years, and other than Appellant's efforts to verbally communicate with Boyer, Appellant did not engage in any physical contact with Boyer or Appellee.

{¶15} According to Appellee, Appellant was at the bar when she, a friend, and Boyer arrived. A few minutes later, Appellant approached Boyer and kissed him on the mouth. Appellant and Boyer were not friends, so there was no reason for Appellant to

Case No. 22 MA 0032

kiss Boyer. In order to avoid Appellant, Appellee and Boyer walked to the far end of the bar. Then, Gordulic approached Boyer to inquire about the kissing incident.

{¶16} Appellee testified that Appellant "start[ed] backing into [her] and pushing [her] into the bar. And [she] felt [her] body being crushed. So [she] felt that [she] needed to defend [herself]. And this after [Appellant] had been harassing [Appellee and Boyer] relentlessly through the night." (*Id.* at p. 14.)

{¶17} Boyer's account is at odds with the video of the altercation and Appellee's account, as both establish that Appellee's assault on Appellant occurred within a few minutes after the kiss. Appellee's testimony is also at odds with the video as neither she nor Boyer moved from their positions at the center of the bar after Appellant kissed Boyer. Equally confusing is Appellee's testimony that Appellant had been harassing her and Boyer relentlessly through the night, because the kiss then the punch occur within minutes of each other. As a consequence, Appellee's testimony that she punched Appellant after he had "been harassing [Appellee and Boyer] relentlessly through the night" is unworthy of credence.

{¶18} According to Appellant, he was six or seven feet away from the bar talking to his girlfriend. His back was to the bar, and Appellee, who was facing the same direction as Appellant, was standing between Appellant and the bar. Two people were standing between Appellee and the bar. Appellant testified that he was punched, but had no idea that it was Appellee who assaulted him until he watched the security video. After he was punched, Appellant recalled Petronelli, who was bartending that evening, jumping over the bar and ushering Appellant to the men's room.

{¶19} According to Gordulic, she and Appellant arrived at the bar at 10:30 p.m. Appellee and Boyer arrived between a half-hour to an hour later. Gordulic conceded that Appellant "[said] hello to [Boyer]" then Appellant returned to Gordulic, who was standing about four feet from the bar, and began a conversation. At that point, Appellee and Appellant were back-to-back, then Appellee turned and punched Appellant. Gordulic testified that prior to the altercation, she apologized to Boyer for "all the weirdness * * * between the two parties." (*Id.* at p. 59.)

{¶20} Petronelli (the bartender) testified that Appellant arrived roughly one hour before Appellee and Boyer. At some point during the evening while Petronelli was behind

the bar, Appellee was standing near the bar when she struck Appellant in the back of the head and then they started pushing each other. Petronelli jumped over the bar but the parties had already been separated by other patrons when he landed on the patron side of the bar. He testified, "so I just push her off, go back into the bathroom." (*Id.* at p. 41.) Following the melee, Petronelli cautioned both parties that they could remain at the bar so long as they could be civil to one another.

**{¶21}** At the time of the incident, Petronelli was unaware that Appellant had been asked to stop patronizing the bar when Appellee was working. Petronelli further testified that he did not know whether Appellant was informed not to patronize the bar when Appellee was working.

**{¶22}** According to the testimony of Appellee's mother, Appellee had been very upset over the past year by Appellant's behavior. Specifically, she testified that Appellee had been "very upset about it, you know, frets about it and worried [sic] about it, felt uncomfortable." Appellee's mother described Appellee as being frequently depressed and confused. (*Id.* at p. 35.) Appellee's mother conceded on cross-examination that she had never witnessed any of Appellant's alleged conduct.

**{¶23}** At the conclusion of the testimony, the trial court observed:

I am inclined to not order the domestic violence protection order for several reasons. There's four specific elements that have to take place for me to order a domestic violence protection order.

Hear me when I say this, young man. You really do need to see the sign. And I've heard some testimony today that has alarmed me. It alarms me that, you know, you're approaching this young man that she's with for no other reason probably to send a message. And (inaudible) testify to that. But you know I don't know why else would you [sic] be doing that.

But you two tend to want to go to the same places. She works there. I believe it's clear you're not going to be able to go when she works there.

* * *

So, and there's nothing stopping her from coming back here and refiling if you don't stop. Because a lot of this has to do with her frame of mind. And she's fearful.

* * *

Is it domestic violence, which is basically what we hear today. I'm going to tell you it does not meet the elements and I am not going to order it. (Inaudible). (Inaudible).

(*Id.* at p. 61-63.)

**{¶24}** Next, the magistrate cautioned Appellant that his behavior could be the subject of a civil protection stalking order. Appellee interjected, "I guess when I initially filed I wasn't clear on what kind of order this was." The magistrate replied, "(Inaudible) and that could very well be. You need to think that over. * * * You may want to see how things play out." (*Id.* at p. 63.)

**{¶25}** The magistrate then concluded:

And you're doing the right thing. You need to (inaudible) and you need to do it by law. You may want to see how this plays out.

I think – and please at all (inaudible) confused [sic] before maybe you were not upset or not mad or angry. I believe the message has been sent, so. But I cannot order a domestic violence protection order. I cannot do that (inaudible).

(*Id.* at p. 64.)

**{¶26}** Four days later, on January 28, 2022, the magistrate issued an order in which she acknowledged that she had verbally informed the parties at the hearing that the DVCPO would not be granted. However, as a result of "further consideration" by the magistrate, a hearing was scheduled for February 7, 2022, at which time the magistrate would hear additional testimony.

Case No. 22 MA 0032

{¶27} On February 7, 2022, Appellant's attorney filed a motion to set aside the magistrate's order. He argued that the magistrate's decision to accept additional testimony was not prompted by a motion from Appellee, and there was no statutory or common-law mechanism authorizing the magistrate's *sua sponte* action. Appellant's attorney cited Evidence Rule 604(B), captioned "Interrogation by court," for the proposition that the magistrate had the authority to interrogate witnesses, but also the obligation to do so in an impartial manner.

{¶28} On February 10, 2022, Appellant's attorney filed an amended motion to set aside the magistrate's order and motion for dismissal, which supplanted the original motion. Appellant's attorney explained that the magistrate's action appeared to have been prompted by a second DVCPO petition filed by Appellee. According to the amended motion, the second DVCPO petition alleged the same facts, but excluded any reference to the confrontation at the Draught House on November 24, 2021.

{¶29} In a judgment entry filed on March 9, 2022, the domestic relations court sustained Appellant's amended motion and directed the magistrate to "grant or deny the civil protection order based on the evidence presented at the hearing on January 25 [sic], 2022." (3/9/22 J.E., p. 1.) On March 10, 2022, the DVCPO at issue in this appeal was filed and adopted by the domestic relations court.

{¶30} In the DVCPO, the magistrate acknowledges her verbal ruling at the hearing, but cites Ohio law for the proposition that a court speaks exclusively through its docket and journal entries. The magistrate then finds that "[Appellant] engaged in a consistent pattern of conduct, knowingly causing [Appellee] to believe that [Appellant] will cause physical harm to [Appellee] or a family or household member in violation of Ohio Revised Code (A)(1)(a)(ii) [sic] . . .committing a violation of section 2903.211 Menacing by stalking." (3/10/22 J.E., p. 2A.) The DVCPO prohibited Appellant from possessing any deadly weapons while the order was in force and directed Appellant to surrender any deadly weapons currently in his possession.

## LAW

{¶31} A domestic relations court may issue a DVCPO pursuant to R.C. 3113.31, which is governed by the procedural framework of Civ.R. 65.1. "[W]hen granting a

protection order, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." *Felton v. Felton*, 79 Ohio St.3d 34, 42, 649 N.E.2d 672 (1997).

**{¶32}** "Domestic violence" is defined, in pertinent part, as:

(a) The occurrence of one or more of the following acts against a family or household member:

(i) Attempting to cause or recklessly causing bodily injury;

(ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 [menacing by stalking] or 2911.211 [aggravated trespass] of the Revised Code;

\* \* \*

(b) The occurrence of one or more of the acts identified in divisions (A)(1)(a)(i) to (iv) of this section against a person with whom the respondent is or was in a dating relationship.

R.C. 3113.31(A)(1). Further, "[f]amily or household member" includes "a person who \* \* \* has otherwise cohabitated with the respondent within five years prior to the date of the alleged occurrence of the act in question.

**{¶33}** R.C. 2903.211(A), captioned "Menacing by stalking," reads, in pertinent part: "(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person \* \* \* or cause mental distress to the other person." Insofar as the only physical assault clearly established by the record was committed by Appellee on Appellant, we presume that Appellee alleged that Appellant engaged in a pattern of conduct and knowingly caused her physical distress.

**{¶34}** "Pattern of conduct" is defined as two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents, or two or more actions or incidents closely related in time. R.C. 2903.211(D)(1). We have held that a pattern of conduct need not be proven by events

Case No. 22 MA 0032

from two different days. *Morton v. Pyles*, 7th Dist. Mahoning No. 11 MA 124, 2012-Ohio-5343, ¶ 13, citing *Halton v. Crossley*, 5th Dist. Coshocton Nos. 11 CA10 and 11 CA11, 2012-Ohio-550, ¶ 42. Rather, a pattern of conduct can arise out of two or more events occurring on the same day, provided that there are sufficient intervals between them. *Id.* The statute does not define the term "closely related in time," but case law suggests that the evidence should be considered in context, that is, on a case-by-case basis. *Id.*

{¶35} "Mental distress" is statutorily defined as either of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2).

{¶36} The definition of "mental distress" provides a "fairly stringent test" which is more than mere mental stress or annoyance. *Caban v. Ransome*, 7th Dist. Mahoning No. 08 MA 36, 2009-Ohio-1034, ¶ 29, 34. A temporary incapacity is substantial if it significantly impacts the petitioner's daily life, and evidence of changed routine is pertinent. *Ramsey v. Pellicioni*, 7th Dist. Mahoning Nos. 14 MA 134, 14 MA 135, 2016-Ohio-558, 2016 WL 635212, ¶ 20. An inability to sleep or concentrate on work can qualify as a temporary substantial incapacity and can also constitute a condition that would normally require mental health services. *R.G. v. R.M.*, 7th Dist. Mahoning No. 17 MA 0004, 2017-Ohio-8918, 88 N.E.3d 1027, ¶ 17.

{¶37} The appellate standard of review for a protection order depends upon the challenge asserted by the appellant. *Serdy v. Serdy*, 7th Dist. Noble No. 13 NO 400, 2013-Ohio-5532, ¶ 27. We apply an abuse of discretion standard if the challenge concerns the scope of the order. *Williams v. Hupp*, 7th Dist. Mahoning No. 10 MA 112, 2011-Ohio-3403, ¶ 21; *Caban v. Ransome*, 7th Dist. Mahoning No. 08 MA 36, 2009-Ohio-1034, ¶ 7. See also *McBride v. McBride*, 12th Dist. Butler No. CA2011-0-061, 2012-Ohio-

2146, ¶ 10; *Abuhamda-Silman v. Silman*, 161 Ohio App.3d 541, 2005-Ohio-2836, 831 N.E.2d 453, ¶ 9 (8th Dist.). Where the appellant asserts that there was not a preponderance of competent, credible evidence to support the order, we conduct a weight of the evidence review.  *Serdy*, *supra*.

**{¶38}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence" supporting one side over the other. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, 17, applying *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Eastley*, 132 Ohio St.3d 32 at ¶ 12. A reversal on weight of the evidence is ordered only in exceptional circumstances. *Thompkins*, 78 Ohio St.3d at 387.

**{¶39}** To reverse on the weight of the evidence, an appellate court must find that the trier of fact clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice. *Id.* In weighing the evidence, a reviewing court must always be mindful that every reasonable presumption shall be made in favor of the finder of fact.  *Eastley*, 132 Ohio St.3d 328 at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3.

**{¶40}** Moreover, it is the fact-finder who is best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses. See *Seasons Coal*, 10 Ohio St.3d at 80; *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). As a consequence, when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one should be believed. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

## ANALYSIS

### ASSIGNMENT OF ERROR NO. 1

### DID THE TRIAL COURT ERROR [SIC] WHEN IT ORDERED A DOMESTIC VIOLENCE CIVIL PROTECTION ORDER?

**{¶41}** In order to issue the DVCPO, the domestic relations court concluded Appellee established by a preponderance of the evidence that Appellant engaged in a pattern of conduct he knew would cause mental distress to Appellee. Appellee's testimony at the hearing focused in large measure on the events at the Draught House on the evening before Thanksgiving in 2021.

**{¶42}** However, Appellee did not offer any evidence that that she suffered "mental distress," as that term is defined in Ohio case law. For instance, Appellee did not testify that she had difficulty sleeping or working in order to demonstrate temporary substantial incapacity.

**{¶43}** Further, she provided no testimony to establish that Appellant's behavior significantly impacted her daily life. As previously stated, evidence of changed routine is pertinent to the DVCPO analysis. However, there is no evidence in the record that Appellee changed her routine in order to avoid Appellant. Significantly, Appellee sought employment at a bar in 2021 that Appellant had frequented for the previous decade, despite her allegation in the petition that Appellant had been stalking her and Boyer for three years.

**{¶44}** Accordingly, we find the record establishes that Appellee suffered mere stress or annoyance, rather than actionable mental distress. As the greater weight of the evidence does not support the issuance of the DVCPO, we find that the domestic relations court order is a miscarriage of justice, and further find that Appellant's first assignment of error is well-taken.

## ASSIGNMENT OF ERROR NO. 2

### DID THE TRIAL COURT ERROR [SIC] WHEN IT ORDERED APPELLANT TO SURRENDER HIS DEADLY WEAPONS?

**{¶45}** As we have concluded that Appellant's first assignment of error has merit, Appellant's second assignment of error is moot.

## CONCLUSION

{¶46} For the foregoing reasons, the judgment entry of the domestic relations court is reversed and vacated.


Waite, J., concurs.

Hanni, J., concurs.

[Cite as *Hammond v. Sait*, 2023-Ohio-893.]

_____

For the reasons stated in the Opinion rendered herein, the first assignment of error is sustained and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Domestic Relations Division, of Mahoning County, Ohio, is reversed and vacated.  Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**