[Cite as *A.M. v. Leone*, 2025-Ohio-728.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

A.M.,

Petitioner-Appellee,

v.

DOMINIC R. LEONE,

Respondent-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 24 MA 0077, 24 MA 0083**

---

Civil Appeals from the
Court of Common Pleas, Domestic Relations Division, of Mahoning County, Ohio
Case No. 2024 DV 00277

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Matthew C. Giannini*, for Petitioner-Appellee (No Brief Filed) and

*Atty. Dominic R. Leone*, Pro Se Respondent-Appellant.


Dated:  March 4, 2025

**DICKEY, J.**

**{¶1}** Respondent-Appellant, Attorney Dominic R. Leone ("Appellant"), acting pro se, appeals two judgment entries of the Mahoning County Court of Common Pleas, Domestic Relations Division, in this action for a domestic violence civil protection order ("DVCPO"), filed on behalf of the mother of Appellant's child, A.M. ("Appellee"), her nine-year-old son, and the couple's four-month-old daughter ("Daughter"). The issue of Daughter's permanent custody was pending in juvenile court when the petition was filed and throughout the lower court proceedings.

**{¶2}** Appellant contends there is insufficient evidence in the record to support the issuance of the DVCPO. Appellant also challenges an interim judgment entry, which authorized Appellee to return cash and certain personal property to Appellant during a visitation exchange without prior notice to Appellant. Appellant argues both judgment entries on appeal, as well as a hearing conducted on May 21, 2024, establish the domestic relations court was motivated by religious bias, predicated upon Appellant's efforts in the contemporaneous juvenile court proceedings to prevent Daughter's baptism. Finally, Appellant contends the DVCPO violated his First Amendment right to free speech.

**{¶3}** For the following reasons, we find there is competent, credible evidence supporting the issuance of the DVCPO. We further find the domestic relations court did not abuse its discretion in authorizing the return of Appellant's personal property at a visitation exchange due to Appellant's failure to attend the hearing at which the matter was resolved. Finally, we find the domestic relations court did not abuse its discretion in ordering destruction of Appellant's personal property due to Appellant's failure to assert his rights.

## FACTS AND PROCEDURAL HISTORY

**{¶4}** On May 7, 2024, Appellee filed a petition for DVCPO and ex parte protection order pursuant to R.C. 3113.31. According to the petition, Appellant was on probation, suffering mental health problems, an abuser of alcohol and illegal drugs, and had threatened other people and abused family pets. Appellee requested temporary custody of Daughter until further order of the court.

**{¶5}** Appellee provided the following recitation of Appellant's alleged conduct in the information for parenting proceeding affidavit:

I was in a relationship with [Appellant] from 10/22 to 9/23 and we had [Daughter]. [Appellant's] behavior has been concerning, eradict [sic], and aggressive since the end of our relationship.

We are currently in the middle of litigation [in juvenile court] and [Appellant] has supervised visitation M-W-F from noon until 4 p.m. with his mother [ ].

Appellant is continually threatening me with legal action due to his allegations of my father being dangerous, wanting to baptize [Daughter], providing spoiled breast milk. [Appellant] continuously calls me crazy and mentally unstable in text messages.

On 5/6/2[4], [Appellant] called the rectory at [a local Roman Catholic church] and spoke to the secretary [name redacted], stating if [Daughter] were to be baptized he would show up to the church and cause problems/cause a scene. His behavior is unpredictable and aggressive and I am scared he is going to hurt [Daughter], myself, and my son.

Upon talking to [the guardian ad litem ("GAL")] last week I grew even more concerned as he described [Appellant's] mood and disposition with him. [The GAL] described [Appellant] as "flipping a switch" and worries about his mental health. [Appellant] has sought out a mental disability last year since loosing [sic] the election in Spring 2023 and since being charged with a restraining order [with] the mayor of Struthers in spring of 2023.

When I was in labor he snuck onto a locked unit at St. E's to look for me after I told him I didn't want him present for the birth.

[Appellant] has reached out to my ex-husband pleading for him to take my son away from me saying I'm an unfit mother.

I am in fear for [Daughter] due to his behavior and acute mental instability as well as fearful for my safety and my son.

{¶6} The domestic relations court issued an ex parte order on May 7, 2024. The domestic relations judge recused herself on May 8, 2024. The Honorable Joseph Giulitto, a retired judge of the Portage County Court of Common Pleas, Domestic Relations Division, was assigned to the case.

{¶7} A hearing was conducted on the ex parte order on May 21, 2024 ("May 21st hearing"). Appellant alleges in his appellate brief that the domestic relations court forced him to enter the consent order that resulted from the May 21st hearing.

{¶8} Counsel for the parties conferenced with the domestic relations court off the record prior to the hearing. Evidently, Appellant's counsel represented to the domestic relations court that Appellant had agreed to a consent order extending the ex parte order through August 31, 2024, in order to avoid an evidentiary hearing and merits ruling.

{¶9} Counsel and the parties then attempted to place the material terms of their agreement on the record, however, the domestic relations court was unable to call the case before Appellant's accusations regarding Appellee and her father commenced:

THE COURT: Good afternoon.

APPELLANT: Did you tell him about the child abuse?

COUNSEL: We brought everything up (inaudible).

APPELLANT: Did you tell him there's a motion pending for child abuse in the court against [Appellee] and her father?

Judge, did they tell you about the child abuse?"

(5/21/2024 Hrg., p. 2.)

{¶10} In an effort to explain the narrow purpose of the hearing to Appellant, Appellant's counsel summarized the proposed consent order as follows, "[c]onsent means you're going to stay away from [Appellee]. There's no finding of domestic violence." Appellant asked, "[w]hat about against her?" His counsel responded, "there

Case Nos. 24 MA 0077, 24 MA 0083

isn't one filed." Appellant replied, "I'm going to file one then against her – her parents for child abuse." (*Id.*, p. 3.)

**{¶11}** The domestic relations court called the case and acknowledged for the record that the parties had agreed to execute a consent order. However, Appellant responded, "[n]o. I didn't agree to that . . . I think we should have a hearing." (*Id.*, p. 4-5.) Appellant argued he was "the most nonviolent," he merely threatened Appellee with legal action according to the petition, and there was insufficient evidence for the issuance of a DVCPO. More pointedly, Appellant summarized the allegations in the petition as "bullshit." (*Id.*, p. 5.)

**{¶12}** Appellant's counsel again attempted to explain to Appellant that the proposed consent order would postpone the merits determination, which would allow Appellant to continue his mental health treatment. The consent order would make it possible for Appellant to seek dismissal of the petition at a subsequent hearing, if he could demonstrate he is medically compliant and not a threat to Appellee and the children. The domestic relations court likewise explained the matter would be reset for an evidentiary hearing on the petition in mid-August, to determine whether the DVCPO should be dismissed or extended, dependent upon the success of Appellant's mental health treatment.

**{¶13}** Undeterred, Appellant asked, "[w]hat about for her?" (*Id.*, p. 7.) The domestic relations court explained Appellant was the respondent in the case and no petition had been filed against Appellee, which limited the issue before the domestic relations court to Appellant's alleged conduct.

**{¶14}** The domestic relations court added, "[y]ou're an attorney. I understand you were formerly a judge. If anything you should be on guard to be an example to society as opposed to a respondent." Appellant replied, "You should be, too. You should tell [Appellee] no in this instance. That's what I think." (*Id.*) Appellant added the domestic relations court should have "[thrown] [the petition] out when [Appellee] filed it." (*Id.*, p. 8.)

**{¶15}** What follows in the remaining 66 pages of the May 21st hearing transcript is the domestic relations court and Appellant's counsel trying to convince Appellant to enter into the consent order, while Appellant hurls accusations at Appellee, Appellee's father, and Appellee's counsel. Appellant called Appellee "crazy" and claimed she had

been a victim of abuse by her parents. He reiterated his intention to file a restraining order against her parents the following day.

{¶16} In response, the domestic relations court observed, "if your attitude today is extended over a period of time through August 31st, you can almost be assured that the Court's gonna [sic] extend the restrictions being imposed on you." (*Id.*, p. 10.) Appellant responded, "[f]or what reason? You have no facts to base that on, sir . . . I mean, you can't rule on my attitude." (*Id.*, p. 10-11.)

{¶17} Next, Appellant suggested adding a provision in the consent order prohibiting Appellee's parents from spending time with Daughter. The domestic relations court explained it had no jurisdiction over Appellee's parents. Appellant then predicated his execution of the consent order on Appellee's agreement that she would keep her parents away from Daughter.

{¶18} In a non sequitur, Appellant accused Appellee of theft. He further asserted Appellee "tried to set [him] up with the police two or three times." (*Id.*, p. 16-17.) The domestic relations court accused Appellant of being "argumentative," and Appellant responded, "[b]ecause that's what we're supposed to do. We're in a court." (*Id.*, p. 19.)

{¶19} Later, Appellant asked, "[i]s [Appellee] going to be ordered to go the counseling for child abuse or not?" (*Id.*, p. 20.) The domestic relations court explained Appellee was not the subject of the petition, and Appellant responded he would "file [a petition naming Appellee as the respondent] tomorrow." (*Id.*, p. 21.)

{¶20} At one point, the domestic relations court asked, "if [Appellee] is such a terrible person why did you get involved with her and have a child?" Appellant responded that it was the biggest mistake of his life. The domestic relations court replied, "[w]ell, if you made a mistake then you're going to pay the price for it." (*Id.*, p. 26-27.)

{¶21} The domestic relations court continued, "[f]or the sake of your child. Get a hold of your emotions. Seek the counseling that is being ordered here." Appellant responded, "Why are there – why are you ordering that? That's – that's – I'm not gonna [sic] to agree with that." To which his counsel replied, "[b]ut you're already in counseling." (*Id.*, p. 27.)

{¶22} Appellant's counsel tried once again to impress upon Appellant the benefit of addressing the merits of the petition after Appellant had the opportunity to undergo several months of mental health treatment:

Agree to the consent to stay away from [Appellee] until August 31. The Court's gonna [sic] have a review on August 14th. If everything's calm it could get terminated on that day, which is about 90 days, if it goes to August 31st. It could go longer. But you're the – you're the master of your own fate; okay?

(*Id.*, p. 28-29.)

{¶23} Unmoved, Appellant called Appellee "a horrible, disgusting person." (*Id.* at p. 30.) Appellant's counsel observed Appellant believed Appellee was unstable, but Appellant was "on a tangent and [ ] looking like [Appellant was] not stable." Appellant responded he was aggressively defending himself. In response to Appellant's accusation that Appellee was a horrible mother, the domestic relations court responded, "then maybe [Daughter] should be taken away from both of you." (*Id.*, p. 38-39.)

{¶24} Appellant argued the ex parte order should not have been granted as the petition did not allege physical threats, only the threat of litigation. Appellant further argued he did not threaten the clerk at the rectory, and he did not threaten Appellee's ex-husband when Appellant encouraged Appellee's ex-husband to pursue custody of his son.

{¶25} The subject turned to Daughter's upcoming baptism. When Appellant's counsel explained to the domestic relations court that both Appellant and Appellee were the same religion, Appellant responded he was "thinking of converting to Judaism." Appellant's counsel then explained to Appellant that he had previously agreed to Daughter's baptism at a juvenile court hearing. Appellant responded, "[t]hen [Appellee] stole off me." (*Id.*, p. 40.)

{¶26} The domestic relations court gave Appellant two options: Sign the consent order or an evidentiary hearing would be scheduled. Appellant asked that the proposed

consent order be read aloud before he executed it. At the conclusion of the recitation, Appellant stated, "[he] didn't like some of the words in there." (*Id.*, p. 43.)

**{¶27}** Appellant objected to the requirement that he continue counseling, even though counseling was included in a previous order of the juvenile court. Appellant announced he would never speak to Appellee again, but might talk to her father.

**{¶28}** Appellant's counsel asked, "are you willing to consent to stay away from [Appellee]." Appellant responded, "[y]eah." (*Id.*) Then, Appellant's counsel noted the baptism was scheduled for June 15, 2024. Appellant argued the baptism was the subject of a hearing in juvenile court set for June 12, 2024.

**{¶29}** Appellant's counsel reminded Appellant that he was permitted to attend the baptism. Appellant responded, "I might go there with some blood and stuff, blood and guts." (*Id.*, p. 49.)

**{¶30}** When opposing counsel characterized Appellant's statement as a threat, Appellant said he would attend with a white, black, or red flag, instead of blood and guts. (*Id.*, p. 51.) Appellant was cautioned his proposed conduct could result in a charge of disorderly conduct.

**{¶31}** Appellant's counsel asked again, "[a]re you willing to consent on the record to this civil protection order for a period of – " and Appellant responded, "[i]f – if he strikes some of those terms, yes." (*Id.*, p. 54.) Appellant's counsel explained the conditions were standard, and Appellant would have to agree to stay away from Appellee. Appellant asked if he could still contact Appellee's ex-husband, to which Appellant's counsel responded that contact with Appellee's ex-husband would not be prohibited. Appellant finally agreed to the standard conditions and to execute the consent order.

**{¶32}** While the domestic relations court reviewed the standard conditions with Appellant, Appellant informed the domestic relations court that Appellant had investigated Appellee's counsel for domestic violence. Despite consistent efforts by Appellant's counsel to silence Appellant, Appellant continued to describe details of an investigation he undertook as a prosecutor against Appellee's counsel. Appellant asserted the previous investigation was the reason Appellee's counsel had filed the petition for DVCPO at issue in this appeal.

{¶33}  At the conclusion of the hearing, Appellant also told the domestic relations judge that "[Appellant] would like to say good job [to the domestic relations judge]," but "[Appellant didn't] think [the domestic relations judge] did a good one." (*Id.*, p. 60.)  The domestic relations court advised Appellant, "I suggest when you see your – your physician or your doctor or psychiatrist and psychologist that you indicate that you're an angry person." Appellant responded, "[y]our opinion of me means nothing." (*Id.*, p. 65.) Appellant opined the domestic relations judge was not qualified to diagnose Appellant, and the domestic relations judge should "stick in his own little ring." (*Id.*, p. 67.)

{¶34}  According to the consent order/DVCPO memorializing the hearing, a status conference was scheduled for August 14, 2024, "to determine whether to extend or terminate the order."  That same day, the juvenile court reinstated Appellant's visitation with Daughter, which had been suspended as a consequence of the ex parte order. The domestic relations court ordered the visitation exchanges to be conducted at the Poland Fire Department ("fire department") and any and all communications between the parties be accomplished through the parenting application, "My Family Wizard."  Further, Appellant was ordered to continue mental health treatment, including therapy and medication.

{¶35}  Appellant's counsel filed a motion to withdraw on May 30, 2024.  The motion was sustained on June 4, 2024.

{¶36}  Appellant, pro se, filed a motion to modify or terminate the consent order/DVCPO on June 24, 2024.  The motion reads in relevant part, "[Appellee] has [Appellant's] personal property (riding mower and great grandmother's dishes). [Appellant] wishes to communicate with [Appellee] to retrieve his personal belongings. Additionally, [Appellant] is representing himself and wishes to complete discovery." The motion was set for a hearing on July 29, 2024.

{¶37}  On July 8, 2024, Appellant filed a motion to continue the hearing.  Appellant requested a "short continuance," without providing any grounds, and further requested permission "to utilize the civil rules of procedure prior to the next hearing." On July 10, 2024, Appellant filed an amended motion to continue the hearing, which was identical to the original motion, but for the addition of the word "AMENDED" in the caption.

**{¶38}** In a judgment entry filed on July 12, 2024, the domestic relations court overruled Appellant's motion to continue.  The judgment entry reads in its entirety:

> [Appellant's] motion to continue is denied. The hearing scheduled for July 29, 2024 at 1:30 p.m. shall be limited to determine what personal property and/or funds that [Appellant] claims remains in [Appellee's] possession.  All other issues shall be addressed at a future hearing or at the currently scheduled hearing of August 14, 2024 at 1:00 p.m.

**{¶39}** On July 19, 2024, Appellant filed a motion to strike (withdraw) his motion to modify the consent DVCPO.  Further, Appellant notified the domestic relations court of Appellant's intent to "use his previous prosecutor/suspect relationship with [Appellee's] counsel at future hearings."

**{¶40}** Despite the motion to strike, which was pending for ten days, the domestic relations court conducted the hearing on the motion to modify on July 29, 2024.  Appellant failed to appear.  Appellee explained at the hearing that Appellant told her through the parenting application that he did not attend the hearing because it conflicted with his visitation with Daughter.  The domestic relations court observed Appellant's failure to appear constituted a waiver of any future claims of personal property in Appellee's possession.

**{¶41}** Appellee testified Appellant requested the return of a riding mower and his grandmother's dishes.  Appellee's counsel asked if Appellee could return the property during a scheduled visitation exchange.  More specifically, Appellee asked to return the property at noon on August 2, 2024 (four days after the hearing) during the next-scheduled visitation exchange.

**{¶42}** Appellee warranted she would arrange to have the personal property transported to the fire department at noon on August 2, 2024.  She further warranted she had a cashier's check in Appellant's name in an amount determined earlier that day at a hearing before the juvenile court.  The amount appears to reflect the money Appellant accused Appellee of stealing at the July 29, 2024 hearing.  Appellee also referred to "a few shovels" belonging to Appellant that were in her garage.

**{¶43}** The domestic relations court ordered Appellee to return Appellant's items, as well as any other personal property belonging to Appellant she might discover in the interim, on August 2, 2024 at the next visitation exchange. The judgment entry on appeal is dated August 2, 2024 ("August 2nd judgment entry") and reads in relevant part:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that on Friday, August 2, 2024 at noon (the date and time in which [Appellant] commences his parenting time at the Poland Village Police [sic] Department) the following items shall be presented to [Appellant]: a riding lawn mower; his grandmother's dishes; and two shovels. [Appellant] does hereby waive any and all further claim for any other personal properties. In addition, [Appellee] shall present to [Appellant] a cashier's check in the amount of $148.43.

**{¶44}** The August 2nd judgment entry contains instructions for service, and requests that copies of the order be sent by regular mail to Appellant and Appellee. However, the judgment entry was filed the very same day that the delivery of the personal property was scheduled.

**{¶45}** On August 6, 2024, the merits hearing was rescheduled from 1:00 p.m. to 11:00 a.m. on August 15, 2024. Appellant did not appear at the August 15, 2024 hearing, and Appellee was the only witness to offer testimony.

**{¶46}** Appellee testified her interactions with Appellant were limited to visitation exchanges and communications through the parenting application. Appellee was afraid for herself and her children because Appellant is "unpredictable" and she does not know "what he's going to say or do." (8/15/24 Hrg., p. 7.)

**{¶47}** Appellant consistently accused Appellee and her father of being "child abuser[s]" on the parenting application. In her conversation with the GAL on the same day as the hearing, the GAL asked Appellee if she and/or her father had a history of child abuse and neglect.

**{¶48}** Appellee explained Appellant had previously agreed to Daughter's baptism in the juvenile court because both parties were Catholic. However, after Appellee notified Appellant that the baptism had been scheduled:

> [Appellant] called [the rectory] and talked to the secretary. The secretary then called [Appellee] saying that [Appellant] called [the secretary] and that he had threatened the secretary, that he – if this proceeds that he's going to show up. And [the secretary] called [Appellee] and then – and then he also said the thing about there will be blood and guts if the baptism – if I proceed with it.

(*Id.*, p. 9.) It is not clear from the transcript whether Appellee testified Appellant made the "blood and guts" comment to the secretary or Appellee was referring to Appellant's statement at the May 21st hearing. Appellee did not otherwise explain the alleged threat made to the secretary.

**{¶49}** As a consequence of Appellant's "blood and guts" comment, Appellee postponed Daughter's baptism. Appellee testified she "didn't know what [Appellant] was going to do at the church if he showed up." (*Id.,* p. 8.)

**{¶50}** Appellee rented a truck and delivered Appellant's belongings to the fire department at noon on August 2, 2024 in compliance with the domestic relations court's order. Appellant refused to accept delivery of his personal property, but Appellant accepted the cashier's check.

**{¶51}** Appellee told the trucking company to dispose of Appellant's property. She testified the driver from the trucking company "either donated [Appellant's property] or he took it." (*Id.*, p. 13.)

**{¶52}** According to Appellee's testimony, Appellant's behavior made her feel "very uneasy, very scared because he – he just is so – you know, just so unpredictable with – with his actions. And [she just does not] know – whenever – you know, what's going to happen." (*Id.*, p. 10.) Appellee further testified she tries to arrange for someone to accompany her to the fire department for visitation exchanges, or she checks in with the secretaries in the fire department so they look out or on the camera during the exchange.

**{¶53}** Finally, Appellee testified Appellant refused to end his visitation with Daughter at the scheduled time on July 29, 2024. Appellant asserted Appellee delivered Daughter one hour late due to her attendance at the July 29, 2024 hearing, so he returned Daughter one hour past the scheduled time. Appellee requested the DVCPO remain in place for five years.

**{¶54}** The domestic relations court summarized Appellee's testimony in the August 21, 2024 judgment entry ("merits decision") and without providing any legal analysis extended the DVCPO to expire on May 7, 2029 (the maximum period allowed). The merits decision concludes:

> [Appellant] may petition the court to modify or terminate this Order upon verification of the appropriate counseling, psychological and/or psychiatric treatment, and compliance with all medications. In addition, thereto, [Appellee] has fully complied with the prior Order of this Court dated August 2, 2024 in regard to the return of the personal property to [Appellant.] As the result [sic], [Appellant] has waived any and all right, claim and interest to the riding lawnmower, his grandmother's dishes, and the two (2) shovels, and [Appellee] may dispose of same.

8/21/24 J.E., p. 2.

**{¶55}** These timely appeals followed.

## LAW

**{¶56}** A domestic relations court may issue a DVCPO pursuant to R.C. 3113.31, which is governed by the procedural framework of Civ.R. 65.1. "[W]hen granting a protection order, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." *Felton v. Felton*, 79 Ohio St.3d 34, 42 (1997). The phrase "family or household member" includes "[t]he natural parent of any child of whom the respondent is the other natural parent . . . ." R.C. 3113.31(A)(3)(b).

**{¶57}** "Domestic violence" is defined, in pertinent part, as:

> (a) The occurrence of one or more of the following acts against a family or household member:
>
> . . .

(ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 [menacing by stalking] or 2911.211 [aggravated trespass] of the Revised Code;

. . .

R.C. 3113.31(A)(1).

{¶58} R.C. 2903.211 prohibits menacing by stalking. R.C. 2903.211(A) provides:

(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. . . .

(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:

(a) Violate division (A)(1) of this section[.]

" 'Pattern of conduct' means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1).

{¶59} "Mental distress" is statutorily defined as either of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2).

**{¶60}** The definition of "mental distress" provides a "fairly stringent test" which is more than mere mental stress or annoyance. *Caban v. Ransome*, 2009-Ohio-1034, ¶ 29, 34 (7th Dist.). A temporary incapacity is substantial if it significantly impacts the petitioner's daily life, and evidence of changed routine is pertinent. *Ramsey v. Pellicioni*, 2016-Ohio-558, ¶ 20 (7th Dist.). An inability to sleep or concentrate on work can qualify as a temporary substantial incapacity and can also constitute a condition that would normally require mental health services. *R.G. v. R.M.*, 2017-Ohio-8918, ¶ 17 (7th Dist.).

**{¶61}** The appellate standard of review for a protection order depends upon the challenge asserted by the appellant. *Serdy v. Serdy*, 2013-Ohio-5532, ¶ 27 (7th Dist.). Appellate courts apply an abuse of discretion standard if the challenge concerns the scope of the order. *Williams v. Hupp*, 2011-Ohio-3403, ¶ 21 (7th Dist.); *Caban v. Ransome*, 2009-Ohio-1034, ¶ 7 (7th Dist.). Where the appellant asserts that there was not a preponderance of competent, credible evidence to support the order, an appellate court conducts a weight of the evidence review. *Serdy*, *supra*.

**{¶62}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence" supporting one side over the other. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, 17, applying *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Eastley* at ¶ 12. A reversal on weight of the evidence is ordered only in exceptional circumstances. *Thompkins*, 78 Ohio St.3d at 387.

**{¶63}** "The civil manifest weight of the evidence standard provides that judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Gaylord v. Frazzini*, 2010-Ohio-6385, ¶ 10 (7th Dist.), citing *State v. Wilson*, 2007-Ohio-2202, ¶ 24, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d

279 (1978), syllabus. To reverse on the weight of the evidence, an appellate court must find that the trier of fact clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice. *Id.*

**{¶64}** In weighing the evidence, a reviewing court must always be mindful that every reasonable presumption shall be made in favor of the finder of fact. *Eastley*, 132 Ohio St.3d 328 at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3. Moreover, the fact-finder is best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses. *See Seasons Coal* at 80; *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

## ANALYSIS

**{¶65}** Appellant's assignments of error are addressed out of order for clarity of analysis and grouped together to avoid repetitive analysis.

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRORED [SIC] BY USING RELIGIOUS VIEWS AS THE BASIS FOR GRANTING A [DVCPO] AND ORDERING [APPELLANT] TO BE AMBUSHED WITH HIS BELONGINGS.**

**{¶66}** Although most cogently asserted in his third assignment of error, Appellant argues throughout his appellate brief and his remaining assignments of error that the judgment entries on appeal were the result of the religious bias of the domestic relations judge. However, an appellate court has no jurisdiction to vacate a trial court's judgment based on a claim of judicial bias. *Cooke v. United Dairy Farmers*, 2006-Ohio-4365, ¶ 45 (10th Dist.), citing *Beer v. Griffith*, 54 Ohio St.2d 440, 441-442 (1978).

**{¶67}** The remedy for suspected judicial bias is to file an affidavit of prejudice with the clerk of the Supreme Court of Ohio. *Polivka v. Cox*, 2003-Ohio-4371, ¶ 29 (10th Dist.). The sole authority for determining the disqualification of a judge of a court of common pleas is vested in the Chief Justice of the Supreme Court of Ohio. *Grace v. Perkins Restaurant*, 2025-Ohio-213, ¶ 34, (7th Dist.), citing Ohio Const., art. IV, § 5(C); A party

seeking disqualification of a judge must file an affidavit of disqualification with the clerk of the Supreme Court of Ohio pursuant to R.C. 2701.03. Accordingly, we are without authority to consider Appellant's arguments predicated on alleged judicial bias in his third assignment of error.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED ON AUGUST 15TH, 2024 IN CONVERTING THE PRETRIAL TO FULL HEARING, WITHOUT NOTICE, WITHOUT ALLOWING DISCOVERY, THE COURT USED [APPELLANT'S] RELIGIOUS BELIEFS THAT WERE DISCUSSED AT THE MAY 21ST, 2024 COURT HEARING, IN ADDITION TO [APPELLANT'S] DUE PROCESS RIGHTS AS A PRO SE LITIGANT DISCUSSING THE CASE THE GAL [SIC] AND OTHER RELEVANT WITNESSES, OUTSIDE OF COURT.**

## ASSIGNMENT OF ERROR NO. 4

**THE TRIAL COURT ERRORED [SIC] BY CHANGING THE NATURE OF THE HEARING WITHOUT NOTICE, NOT ALLOWING DISCOVERY, IGNORING EVIDENCE, ALLOWING OPPOSING COUNSEL TO LIE, AND USING RELIGIOUS VIEWPOINTS TO EITHER GRANT A [DVCPO] OR ORDER SAME DAY DELIVERY OF [APPELLANT'S] BELONGINGS.**

{¶68} Appellant challenges various aspects of the issuance of the merits order in his second and fourth assignments of error. First, Appellant contends the domestic relations court erred in converting the August 15, 2024 hearing into a "full hearing." However, the domestic relations court clearly stated the consent order/DVCPO would be revisited at the August 15, 2024 hearing. Similarly, the domestic relations court limited the scope of the July 29, 2024 hearing to the ownership of Appellant's personal property, leaving all other matters to be addressed at the August 15, 2024 hearing.

{¶69} Next, Appellant argues the domestic relations court should have consulted the parenting application, because it would have revealed Appellee had lied at the merits

hearing about the content of her communications with Appellant. The parties' communications on the parenting application are not in the record, so Appellant's characterization of the parties' communications is speculative. Of equal import, the domestic relations court had no duty or obligation to ferret out evidence on Appellant's behalf. Appellant was acting pro se and therefore responsible for offering evidence at the merits hearing to contravene Appellee's testimony.

{¶70} Third, Appellant argues the domestic relations court violated his First Amendment right to free speech, pursuant to the law announced in *Bey v. Rasawehr*, 2020-Ohio-3301. The civil protection order in that case prohibited the appellant from posting accusations in the future that certain estranged family members were complicit in the deaths of his father and brother-in-law. Because the prohibition constituted a prior restraint, the Ohio Supreme Court vacated the provision in the civil protection order enjoining future postings about appellees or postings that express, imply, or suggest that appellees were culpable in the deaths of their husbands. However, there is no similar provision in the DVCPO on appeal.

{¶71} Appellant further argues the DVCPO was issued to punish him for expressing his religious beliefs. As previously stated, to the extent Appellant's free speech argument is predicated upon alleged judicial bias, we are without authority to consider the argument.

{¶72} Fourth, Appellant argues the domestic relations court violated his due process rights by not authorizing discovery. Appellant never identified the discovery he sought.

{¶73} Civ.R. 65.1 provides special procedures for civil protection orders consistent with applicable statutory requirements that account for the protection of victims of domestic violence, stalking, and sexually oriented offenses. Civ.R. 65.1, Staff Note (July 1, 2012 Amendment). Under Civ.R. 65.1(D)(2), "[d]iscovery may be had only upon the entry of an order containing all of the following to the extent applicable: (a) The time and place of the discovery; (b) The identities of the persons permitted to be present, which shall include any victim advocate; and (c) Such terms and conditions deemed by the court to be necessary to assure the safety of the Petitioner, including if applicable, maintaining

the confidentiality of the Petitioner's address." In the absence of a request for specific discovery, the domestic relations court could not comply with Civ. R. 65.1.

**{¶74}** Finally, Appellant contends there was no competent, credible evidence to support the issuance of the DVCPO. Appellant cites our opinion in *Darling v. Darling*, 2007-Ohio-3151 (7th Dist.) for the proposition that his harsh words and accusations against Appellee and her father are insufficient to establish menacing by stalking. In *Darling,* we observed:

> "[E]xplicit threats are not necessary to establish the elements of menacing by stalking as set forth in R.C. 2903.211." *State v. Smith* (1998), 126 Ohio App.3d 193, 200, 709 N.E.2d 1245. Menacing by stalking can be based, in part, on the defendant using obscene or derogatory language or profane gestures. *State v. Bilder* (1994), 99 Ohio App.3d 653, 656, 651 N.E.2d 502. It is not at all clear, though, that merely rude gestures or snide remarks to another person constitute menacing by stalking, and by extension, justify issuing a civil stalking protection order.

*Id.* at ¶ 22.

**{¶75}** At the merits hearing, Appellee carried the burden of proving a pattern of conduct by Appellant, which demonstrates Appellant knowingly caused Appellee to suffer mental distress and/or knowingly caused Appellee to believe Appellant would cause her or the children physical harm. A pattern may consist of two incidents close in proximity.

**{¶76}** According to the petition and Appellee's testimony at the merits hearing, Appellant called the rectory on May 6, 2024 and threatened the secretary that he would engage in some aberrant behavior to disrupt the baptism. Roughly two weeks later, Appellant stated at the May 21st hearing that he "might go [to the baptism] with some blood and stuff, blood and guts." When opposing counsel observed Appellant's statement could be interpreted as a threat, Appellant said he would attend with a white, black, or red flag, "instead of blood and guts."

**{¶77}** While it is true that the "blood and guts" comment does not necessarily constitute a physical threat, it caused mental distress, particularly coupled with Appellee's

testimony that Appellant also threatened the secretary at the rectory that he would disrupt the baptism. Appellant's threatened behavior at the scheduled baptism, rather than his objection to the baptism itself, supports the extension of the DVCPO.

{¶78} Appellant argues there is no evidence that he acted knowingly. However, his comments, actions, and threats were made knowingly with the intent to disrupt the baptism, and were sufficient to result in the cancellation of the event due to Appellee's mental distress.

{¶79} Moreover, "[t]estimony that a respondent's conduct caused the person considerable fear can support a finding of mental distress." *Nolder v. Nolder*, 2023-Ohio-2371, ¶ 23 (7th Dist.), quoting *A.V. v. McNichols*, 2019-Ohio-2180, ¶ 24 (4th Dist.). "[T]he testimony of the victims themselves as to their fear is sufficient to establish mental distress[.]" *R.G. v. R.M.*, 2017-Ohio-8918, at ¶ 27 (7th Dist.), quoting *Elkins v. Manley*, 2016-Ohio-8307, ¶ 15 (8th Dist.). Appellee testified that she fears for her safety and the safety of her children, due to Appellant's erratic behavior. Appellee testified the GAL shared her concerns about Appellant's mercurial temperament. Further, Appellant's conduct at the May 21st hearing demonstrated a lack of respect for the authority of the domestic relations court, as well as an objective lack of self-control.

{¶80} Finally, although Appellee did not provide any testimony regarding any physical or emotional problems she suffered as a result of the mental distress caused by Appellant, i.e., lack of sleep or inability to concentrate, Appellee canceled Daughter's baptism as a result of Appellant's threatened conduct. Appellee's decision to cancel the baptism demonstrates both her mental distress and her fear that Appellant would disrupt the occasion. Similarly, Appellee testified that she attempted to arrange a companion to attend visitation exchanges, and when she was unable, she would ask fire department employees to watch the exchange in case of trouble. Accordingly, we find Appellee altered her schedule as a consequence of Appellant's behavior.

{¶81} Because the record establishes Appellant engaged in a pattern of conduct of at least two instances close in proximity that knowingly caused mental distress to Appellee, as evidenced by the cancellation of the baptism and the alteration of her routine, we find the weight of the evidence supports the issuance of the DVCPO. Based on the

competent, credible evidence in the record, we find Appellant's second and fourth assignments of error are meritless.

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED BY ISSUING AN ORDER ON AUGUST 2ND, 2024 TO RETURN [APPELLANT'S] PERSONAL BELONGINGS TO AN EMERGENCY ZONE, WITHOUT PRIOR NOTICE, AT AN INFANT EXCHANGE, TO [APPELLANT], ON AUGUST 2ND, 2024, RESULTING IN TOTAL LOSS. THE TRIAL COURT ORDER IS UNREASONABLE, ARBITRARY, AND UNCONSCIONABLE AND SHOULD BE OVERTURNED.**

**{¶82}** In his first assignment of error, Appellant contends the domestic relations court violated his right to due process by exceeding the scope of its July 12th judgment entry. The judgment entry limited the subject matter of the July 29, 2024 hearing to the determination of Appellant's alleged ownership of the personal property and funds in Appellee's possession.

**{¶83}** Appellant contends the domestic relations court abused its discretion in ordering the delivery of Appellant's personal property, without notice, at the visitation exchange and in an emergency zone. Appellant argues, "[t]he results of the order are unconscionable as it ambushed the [Appellant], subjected [Appellant] to risk of criminal/civil exposure, and resulted in the total and complete loss of valuable and priceless items." (Appellant's Brf., p. 8.)

**{¶84}** Appellant argues in his brief that the delivery of the personal property jeopardized Daughter's safety and obstructed the fire department. As Appellant did not appear at the merits hearing, there is no evidence in the record that Daughter was at risk of harm or the delivery obstructed the operation of the fire department.

**{¶85}** Next, Appellant contends he received no notice of the planned delivery of his personal property, because the judgment entry memorializing the July 29, 2024 hearing was issued the same day that delivery was scheduled at the fire department. Appellant would have received notice regarding the delivery of his personal property, but

Case Nos. 24 MA 0077, 24 MA 0083

for his failure to appear at the July 29, 2024 hearing. Moreover, the location of the personal property exchange was reasonable, given the fact that personal contact between the parties was limited to the visitation exchanges at the fire department, and August 2, 2024 was the next-scheduled visitation exchange following the hearing.

{¶86} Finally, Appellant asserts the trial court erred in ordering the destruction of his personal property. After Appellant refused to accept his personal property during the visitation exchange, he failed to assert his rights in his personal property. Because Appellant did not file a motion notifying the domestic relations court that he was unable to retrieve his personal property, or appear at the merits hearing, the domestic relations court did not abuse its discretion in ordering the destruction of Appellant's personal property.

{¶87} Based on the foregoing facts, we find the domestic relations court did not act unreasonably in ordering the return of Appellant's personal property during the next-scheduled visitation exchange, or in ordering the destruction of Appellant's property due to Appellant's failure to assert his rights in the property at either the hearing on July 29, 2024 or by filing a post-hearing motion in the trial court. Accordingly, we find Appellant's first assignment of error has no merit.

## CONCLUSION

{¶88} For the foregoing reasons, we affirm the issuance of the DVCPO.

Waite, J., concurs.

Robb, P.J., concurs.

Case Nos. 24 MA 0077, 24 MA 0083

———————————

For the reasons stated in the Opinion rendered herein, the first, second and fourth assignments of error are meritless and it is the final judgment and order of this Court that the judgments of the Court of Common Pleas, Domestic Relations Division, of Mahoning County, Ohio, are affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**